**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

THERMAN C. PUFFENBARGER, JR.,

     **Plaintiff,**

v.                                **Civil Action No.  1:09CV77**
                                       **(Judge Keeley)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     **Defendant.**

## MEMORANDUM OPINION/REPORT AND RECOMMENDATION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively the Social Security Act ("Act") 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen.P 86.02; Standing Order 6.

## I.  Procedural History

Puffenbarger filed an application for Supplemental Security Income ("SSI") benefits on May 26, 2005 alleging disability onset as of September 4, 2004.  After hearing before the ALJ, an adverse decision was rendered on June 29, 2007.  July 30, 2007 Puffenbarger requested review by the appeals council.  April 23, 2009 the Appeals Council denied Puffenbarger's claim, making the decision of the ALJ the final decision of the Commissioner.  Puffenbarger filed his complaint with this Court on

June 12, 2009.

## II. Statement of Facts

The following statement of facts is derived from a review of the administrative hearing record and the submitted medical records.

Administrative Hearing Record:

Puffenbarger takes: Topomax in the am for bi-polor; Alprazolam for nerves and to help him sleep; and Butalbital for migraine headaches [R.58-59].

Puffenbarger, age 38 at the time of the hearing [35 at the time of his alleged onset of disability] and who was without income except for food stamps, lived with his mother [R. 60-61]. He obtained a GED [general education degree] and took what he described as special education classes in public school. [R. 126]. Puffenbarger worked as: a book boxer and stacker in 2003 earning approximately $3,000 and at a turkey farm in 1996 earning approximately $14,000. [R. 62-62]. He also worked as a hand-sewer in a shoe factory and as a general laborer in the construction industry. [R. 114-120, 122-123, 131-139].

Plaintiff walked into the ALJ hearing using a cane (not prescribed) given to him in Winchester. [R. 64].

Puffenbarger stated that on Labor Day 2004: "this guy hit me in the head with a sledgehammer." [R. 64].

As a result of being hit in the back of the head and then in the side of the head, Puffenbarger was flown to Charlottesville where he was admitted to the UVA hospital. Plaintiff said he died thrice: twice en route in the helicopter and once at UVA. [R.64-65]. Plaintiff stated he "somewhat" recovered. He heard voices until he started taking Topamax. He gets dizzy and falls down when he works on the farm mowing grass and dragging brush. [R. 64-65]. He also stated he could not

keep his balance when walking. [R. 65]. Puffenbarger stated that a voice told him to cut his wrist. He did cut his wrist. The cut required suturing. He complains his hand is now numb. [R. 66]. Puffenbarger stated he gave up his licence to avoid getting a third DUI. He also stated he has not had any alcohol to drink in over a year.[1] [R. 67]. He stated he gets headaches, particularly from loud noises like the running of a lawn mower. He takes medicine, lays down and sleeps until the headaches go away. [R. 68].

Puffenbarger describes his typical day as watching over his polio bedridden mother and getting her things from the store which is located about a half mile from his home. He walks there daily using a cane to maintain his balance on the "chuck hole" ridden road. [R. 69].

Puffenbarger states he has had difficulty making people understand what he says and remembering things since he was hit on the head at the bar. [R. 70].

When confronted by the ALJ with the apparent inconsistency between his testimony of being alcohol free since May 2006 and his medical record [Exhibits 20-21] showing that: he had presented to Dr. Hahn's office in October 2006 admitting he's had three drinks that day and the note of alcohol abuse and had been strongly urged to stop or cut back on drinking, Puffenbarger explained: "That's what I think, but I see, I can't remember. My mind ain't thinking right." [R. 71]. He testified he'd not had anything to drink in the last week or month. [R. 71]. Puffenbarger also admitted that he suffered alcohol abuse and attempted suicide long before being hit on the head with a hammer at a bar. [R. 71-73]. Puffenbarger testified his drinking was less after 2004 into 2005 because he was put on Topamax which helped with the voices in his head. [R. 73, 75]. Puffenbarger stated that he was not drinking any more but that he just couldn't work because he gets dizzy, lightheaded, can not stand loud noises, weak left hand, can't stand up and dig because it throws his back out of place

_____

[1]This would put his last drink of alcohol around May 2006.

(where he got hit in the hip with a hammer). [R. 75]. With respect to his headaches, Puffenbarger testified he tried not to take too many pills and instead would lay down to sleep it off. [R. 76].

Vocational expert Pearis testified: Puffenbarger could do various types of sedentary production jobs of which there were 59,000 to 60,000 nationally and 1,800 regionally. [R.79-81]. He also stated that with respect to those type jobs the employee could not miss more than one day of work per month; would have to pay attention to what he was doing even though it was the type of job that involved simple, unskilled tasks; and would be required to use both hands (dominant hand doing fine work and the other doing grasping and holding). Pearis stated that if the employee had "bipolar disorder that causes ... an organic affective disorder, depression, to some degree ... poor cognitive ability, impaired concentration, impaired judgment, and ... he would be off task on ... days at least 30 to 50 percent of the time" the employee would not be able to do the jobs described. [R. 82].

Medical Record Evidence:

August 18, 2004 Puffenbarger presented to the Emergency Department of Rockingham Memorial Hospital after EMS was called by his mother. Puffenbarger reported he was drinking "some beers earlier today" and he had a "little bit of an argument with his mother." He stated he threatened her that he might take an aspirin overdose because he was mad at her and wanted to get a rise out of her. He took three aspirin. He stated that he did not feel depressed; he never had any intention to kill himself; had not planned to kill himself had no complaints, and had no ringing in his ears or headaches. He was noted to be a 35 year old male who was a heavy alcohol user for quite some time. The record also contains a note that although Puffenbarger is not taking any medications, he gave a history of overdosing on Methadone the year before and that he was trying to kill himself then. There is no supporting medical record of this incident. R. 176-186.

November 23, 2004 Puffenbarger was transported to Rockingham Memorial Hospital by EMS for blood in his urine. When confronted as to why he was there, he stated he had blackouts and had been having some staggering. He reported being hit on the head with a sledgehammer in September and that he had a negative MRI in Winchester. He denied fever or vomiting or any pain. He was diagnosed as "alcohol intoxication and alcohol abuse" and discharged in satisfactory condition on the same date. When asked if he was ready for help with the alcohol that was killing him, Puffenbarger "said he has had enough help in the past." [R. 231]. During additional triage of Puffenbarger, it was noted: "pt to 10/1 by ems. slurred speech. per ems they said they were called because of blood in his urine. pt denies this. says he drank beer today, says 'I'm not that drunk'. Pt pants are wet. says 'i pissed myself'. Pt needed to go to bathroom as soon as he got to the bed. up, amb. To hall bathroom. pt stagering around, spilling urine out of the cup and onto the floor on his way back. pt relates back to old head injury where he was hit in the head with a hammer. (says they were fighting over the last beer) pt says he gets dizzy spells. (poss. from the alcohol consumption). Has slurred speech. no obvious bodily injury.." Puffenbarger is noted to give a history of drinking 24 beers a day. [R.237].

December 24, 2004 Puffenbarger presented to Rockingham Memorial Hospital Emergency Department complaining of head injury a couple of months ago; crossing the road when he felt dizzy and lost his vision/a blackout spell which he claims to have been having over the previous couple of weeks; and leg numbness and pain. Dr. Kramer suspected a blood alcohol level of 0.202 and discharged him with urging that he seek counseling. [R. 246-247].

January 4, 2005 Puffenbarger was seen at the University of Virginia Neurology Clinic for 4 month complaint of headache, dizzy spells and blackouts post assault with hammer to the back of his head in September 2004. Puffenbarger had a normal MRI of the brain and brainstem earlier at

the Winchester Medical Center. His neurological exam was benign except for: slightly increased tone in the bilateral upper extremities; a left sided sensation of warmth when touched with a cold stimulus; difficulty with left heel-shin and difficulty with tandem gait. It was the Dr. Smith's opinion that the constellation of symptoms could "most likely be attributed to post concussive syndrome." Puffenbarger was started on amitriptyline 25 mg. po qd with instructions to return to the clinic in 4-6 weeks. [R. 261].

January 27, 2005 Puffenbarger presented to the Rockingham Memorial Hospital Emergency Department in respiratory distress after an EMS reported overdose of several amitriptyline and benzodiazepine tablets plus marijuana and etoh level of 0.202. He was unresponsive to pain or verbal stimuli. He required intubation with anesthesia, mechanical ventilation and treatment for aspiration with IV antibiotics in intensive care. His diagnosis was: 1) Tricyclic antidepressant overdose; 2) Respiratory failure; and 3) Aspiration pneumonia. The discharge summary noted his diagnoses as: 10 Polypharmacy overdose with amitriptyline and Xanax; 2) Suicide attempt secondary to situational anxiety and depression; 3) History of head injury; and 4) History of long-term alcohol abuse since age 7 [R. 268-278, 287, 288].

January 27, 2005 Cynthia Osborne, D.O. performed a Physical Residual Functional Capacity Assessment on Puffenbarger concluding: he had no exertional limitations existed; he could never climb ladders/ropes or scaffolds but frequently could climb ramps/ stairs, balance, stoop, kneel, crouch and crawl; he had no manipulative, visual, communicative limitations; but for a need to avoid concentrated exposure to hazards such as machinery, heights, etc., he was unlimited with respect to environmental factors. [R. 279-286].

January 31, 2005 Puffenbarger was sent from the Rockingham Memorial Hospital unit where he had been cared for since his admission on the 27th to Psychiatric Consultation within the same

hospital to deal with his attempted overdose. The attempted suicide was due to his concern that the man who hit him in the head with a hammer might escape punishment and his abuse of alcohol helped make him more impulsive at the time. He reported a history of alcohol abuse since probably age 7; that he drinks a 12 pack of beer per day on the week days and a case a day on the weekends; he denies suicidal ideations; he is unemployed; he is irritable, volatile and explosive but only after drinking for a while; he has had feelings of hopelessness and memory loss since being hit on the head; he is divorced; he hears voices when he is not drinking but that they go away when he drinks; and he states he has a short fuse but relates it to when he has been drinking for a while. Notwithstanding his unemployment, Puffenbarger told the evaluators that he earned between $20,000 and $22,000 per year doing odd construction jobs. It was Dr. Conell's impression that Puffenbarger suffers from depressive disorder NOS, mood disorder NOS, alcohol dependence, psychosis NOS and had a global assessment of functioning estimated at 40 to 46. Psychiatric evaluation and treatment as well as controlled medication was recommended. On discharge his GAF was 55. [R. 287-293].

February 8, 2005 Puffenbarger was evaluated for substance abuse by Accurate Assessments of Omaha, NE. The diagnosis was alcohol dependence. It does not appear that any testing was performed and that the evaluation was based on information provided by Puffenbarger.[2] The evaluation is not signed by any physician or psychologist. [R. 379-384].

Puffenbarger was again in Rockingham Memorial Hospital for treatment of an overdose on an unknown quantity of his mother's Halcion and alcohol on April 21, 2005 through April 25, 2005. It was noted that Puffenbarger was last in Rockingham on 2/10/05-2/04/05 for treatment and was discharged to Potomac Highland Guild. Puffenbarger reported he "attended a few times but each

_____

[2]It is also unclear whether Puffenbarger was in Nebraska for the evaluation and for what purpose the evaluation was performed.

visit cost him $10 and he would apparently prefer to spend it on alcohol." [R. 299]. He stated he wanted to kill himself by drinking and overdosing. [R. 300]. Puffenbarger treated for several days and was discharged without medications to again follow-up with appointments at Potomac Valley Guild per order of a state magistrate. [R. 295-296 and 299-302].

June 3, 2005 Puffenbarger presented to Rockingham Memorial Hospital with a self inflicted laceration of the left wrist involving the ulnar artery and flexor tendon (still had sensation in his fingers), acute alcohol intoxication, possible lorazepam ingestion, depression with suicidal gesture and chronic alcohol dependence. He was transferred to the University of Virginia Medical Center for treatment of the wrist laceration on June 4, 2005. [R. 311-312]. As part of his psychiatric work-up, Puffenbarger stated he was unemployed and trying for disability. [R. 360]. It was noted that he was then using alcohol daily. [R. 360].

June 17, 2005 Dr. Shapiro of Eastridge Health Systems evaluated Puffenbarger. He found recent memory and cognition intact. He found mood and affect pleasant and thoughts to be goal directed without psychosis, "suicidality", "homicidality", "dyscontrol" or confusion. Although Puffenbarger referred to a head injury Dr. Shapiro stated: "I seriously doubt that it's having any effect on his cognition at this point." Dr. Shapiro diagnosed adjustment disorder with mixed disturbance of mood and conduct resolved; alcohol dependence, nicotene dependence and GAF 25. [R. 366-367].

June 8, 2005 Puffenbarger was seen by Hahn Medical Practice Inc. for follow-up from his recent hospitalization and a check of his wrist wound which was found to look good with no drainage. [R. 388].

June 11, 2005 Puffenbarger was seen by Hahn Medical Practice Inc. for a check-up at which time sutures were removed from his wrist and it was noted that the wound was well healed. [R.

387and 450].

July 6, 2005 Puffenbarger was seen by Hahn Medical Practice Inc. for a check-up during which it was noted that hist wrist wound was well healed. [R.386 and 451].

August 8, 2005 Puffenbarger was seen by Hahn Medical Practice Inc. for a change in sleeping medicine. [R. 385 and 452].

March 1, 2006 Puffenbarger was seen by Hahn Medical Practice Inc. for prescriptions refills, hip pain and rectal bleeding since July, 2005. [R. 391].[3]

X-ray examination of Puffenbarger's mandible in July 2005 revealed that the mandible was intact; there was no evidence of fracture; the mandibular condyles appeared to be unremarkable as did the adjacent facial bones. In short Puffenbarger had a "[n]ormal mandibular series." [R. 440].

September 8, 2005 Nancy Lott, SDM performed a Physical Residual Functional Capacity Assessment of Puffenbarger. She found no exertional limitations; no postural limitations; no manipulative limitations; no visual limitations; no communicative limitations; and with respect to environmental limitations, Puffenbarger was only to avoid concentrated exposure to such hazards such as machinery, heights, etc. The evaluator noted that "claimant has history of head injury, however physical findings are non-severe" and "claimant has long history of alcohol abuuse [sic]. Claimant is partially credible." [R392-399].

September 12, 2005 Frank D. Roman, EdD performed a Psychiatric Review Technique of Puffenbarger finding: insufficient evidence to determine the existence of a medically determinable mental impairment. Roman repeated the known history from 1/31/ 2005, 4/21/05, 6/3/05, 7/18/05 and noted "Claimant did not keep psych ce or rescheduled psych ce." Roman also noted that Potomac Highlands Guild refused to supply any of Puffenbarger's records unless he came and picked

---

[3]Hahn records for July and August 2005 do not note any complaint of rectal bleeding.

them up to take to Roman. [R. 400-413].

October 14, 2005 Dr. Hahn of Hahn Medical Practice provided a Physician's Summary and medical records to the West Virginia Department of Health and Human Services in which Dr. Hahn, based on contact with Puffenbarger to August 8, 2005 provided the following:

Diagnosis:      Bipolar Syndrome type I

Prognosis:      Good with treatment and regular followup

Length Of Time Incapacity/Disability Is Expected To Last:   Lifetime

Employment Limitation:      High Stress, exposure to alcohol or controlled substances, confrontational situations. [R. 463-464].

January 19, 2006, Christina Goldizen, M.D., a psychiatrist, saw Puffenbarger as an outpatient for evaluation and assessment. Based on the interview without testing, Goldizen concluded Puffenbarger suffered from bi-polar affective disorder with psychosis recurrent; had borderline intelligence functioning; had sustained a head injury; was unemployed and had a GAF of 50. She stated "Pt does require treatment and follow-up. Unable to work." [R. 414-416 and 465-468].

February 23, 2006 Fulvio Franyutti, M.D. performed a Physical Residual Functional Capacity Assessment of Puffenbarger finding: "insufficient evidence/failure to keep ce." [R. 417-424].

Blood work done on Puffenbarger March 1, 2006 required no action or treatment except for LDL. [R. 442-443]. However, repeat draw on March 27, 2006 revealed LDL and Cholesterol within normal limits and no action was required. [R. 444].

March 1, 2006 Puffenbarger presented to Hahn Medical Practice for prescription refills on complaints of hip pain and rectal bleeding since July 2005. [R. 454]

March 22, 2006 G. David Allen, Ph.D. performed a Psychiatric Review Technique of Puffenbarger finding: "Insufficient Evidence Failure to Keep CE." [R. 425-438].

10

April 5, 2006 Puffenbarger presented to Hahn Medical Practice "to review labs, also c/o hand pain - darvocet not helping." [R. 455].

On complaints of right hip pain, x-rays of Puffenbarger's hip and lumbosacral spine were taken on May 24, 2006. The radiologist reported "no fracture or focal bony abnormality can be seen" in the right hip and pelvis; "[n]egative right hip and AP pelvis"; "intact vertebral bodies"; "[b]ony alignment is normal" in lubosacral spine; "[n]egative lubosacral spine." [R. 441].

May 31, 2006 Puffenbarger presented to Hahn Medical Practice with complaints of pain in his right hip and 6 months of not sleeping (hurts laying and sitting). It was noted to review x-rays and provide prescription refills. It was noted that the straight leg test was positive on the right. [R. 456]

June 26, 2006 Puffenbarger presented to Hahn Medical Practice and the note for the visit reflects: "Mr. Puffenbarger ... c/o continued hip pain since being hit in hip with hammer. ('he [was] also hit in head with hammer but that does not hurt') ... he was informed he must see Dr. Hahn for narcotics." [R. 457].

September 20, 2006 Puffenbarger presented to Hahn Medical Practice complaining of headaches and received a refill of headache pills. [R. 458].

October 4, 2006 Puffenbarger presented to Hahn Medical Practice complaining of headaches. The pertinent notes read: "Review b/w (blood work) - Had been aware of possible liver dz (disease) (due to) ETOH (alcohol) intake. Has frequent ha(headaches) (due to) hangovers. Admits to 3 drinks already today." The impressions were: "alcohol abuse; early cirrhosis; tobacco dependence." Puffenbarger was urged to reduce or stop drinking alcohol, avoid tylenol products and to stop smoking. [R. 459].

February 19, 2007 Dr. Hahn of the Hahn Medical Practice noted he had just seen the

Puffenbarger's September 2006 blood work and believed it was necessary to do a CT of the abdomen to check for liver disease. He also noted he had "spoke with pt's lawyer today. He will contact Dr. Goldizen about her evaluation and diagnosis. I will follow up on transamimbis [sp]." [R. 460].

February 26, 2007 Arthur J. Cerami, Jr. MS, PAC provided a Medical Assessment Of Ability To Do Work Related Activities (Mental) and a Psychiatric Review Technique relative to Puffenbarger. [R. 485- In the Medical Assessment, Cerami opined Puffenbarger was poor at following work rules, relating to co-workers, dealing with the public, maintaining concentration; fair with respect to use of judgment, interaction with supervisors, functioning independently; and had no ability to deal with work stresses. He described "distractability (sp), delusional thinking, persecution complex, manic behavior, poor judgment." With respect to Making Performance Adjustments, he described no ability to understand, remember and carry out complex job instructions; poor ability to understand, remember and carry out detailed, but not complex job instructions; and fair ability to understand, remember and carry out simple job instructions noting specifically Puffenbarger had "limitation of comprehension, organization and memory all present." With respect to making personal social adjustments, he noted Puffenbarger had no ability to relate predictably in social situations, to behave in an emotionally stable manner, to demonstrate reliability; and only poor ability to maintain personal appearance specifically noting: "Pt cannot be dependable to attend work regularly, emotional (ability limits interaction ability Pt is very unpredictable."

From September 2004 to the date of the Psychiatric Review Technique, Cerami opined Puffenbarger had: 12/02 Organic Mental Disorder of Bipolar Spectrum Disorder; 12.08 Personality Disorder of Borderline Personality Disorder; 12.09 Substance Addiction Disorder of Alcoholism. With respect to 12.02 Disorders Cerami concluded Puffenbarger evidenced perceptual or thinking disturbances, change in personality, disturbance in mood and emotional liability and impairment in impulse control

12

specifically noting "Pt. has substantial symptoms of Bipolar Spectrum Disorder includes manic/hypomanic impulsivity (sp), perceptual disturbances, substance abuse, periods of depression. He has had issues with confrontation with others that has resulted in personal injuries; and has been in legal trouble including incarceration. Family history shows significant dysfunction, substance abuse and mental illness." With respect to 12.04 affective disorders, Cerami found Puffenbarger exhibited each of the depressive syndrome factors except appetite disturbance with change in weight and all of the manic syndrome factors and found he exhibited bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. With respect to 12.08 personality disorders Cerami found Puffenbarger exhibited all of the factors of inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress except seclusiveness or autistic thinking. With respect to 12.09 Substance Abuse Addiction Disorders Cerami noted: "Pt has had substance abuse issues in the past, primarily with alcohol. This is most likely an attempt at self medication that resulted in dependance. Pt is currently alcohol/drug free." With respect to "B" criteria for rating of functional limitations as a result of 12.08 and 12.03 disorders, Cerami noted Puffenbarger had markedly limited difficulty in maintaining social functioning and in maintaining concentration, persistence, or pace, had four or more episodes of decompensation, each of extended duration. With respect to "C" criteria for rating 12/03 or affective disorders, Cerami noted Puffenbarger had a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate and a current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

March 26, 2007 Puffenbarger presented to Hahn Medical Practice complaining of headaches

and for a prescription check. At the time Puffenbarger's psych assessment was "appropriate/oriented x 3" and the impression was bipolar d/o and alcoholism h/a. [R. 461].

April 9, 2007 Puffenbarger presented to Hahn Medical Practice to "talk about medicine." His psych assessment was "appropriate/oriented x 3." [R. 462].

October 1, 2007 Thomas Stein, ED.D. assessed Puffenbarger: clinical interview; mental status examination, Wechsler Adult Intelligence Scale; and Wide Range Achievement Test. Objective testing indicated full scale IQ of 66. According to the WRAT-3, Puffenbarger reads, spells and does arithmetic at the 4th grade equivalent. [R. 492-498].

Bob Marinelli, Ed.D., performed a Psychiatric Review Technique dated November 5, 2007. He found 12.02 Organic Mental Disorder; 12.04 Affective Disorder; and a medically determinable impairment that does not satisfy the diagnostic criteria for 12.02 Psychological or behavioural abnormalities associated with dysfunction of the brain, to wit: "BIF, Cognitive DO due to HI." but notes no "Pertinent symptoms, signs, and laboratory findings that substantiate the presence of this impairment." With respect to 12.04 affective disorder, Martinelli checked "Disturbance of mood accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: 1. Depressive syndrome characterized by at least four of the following: c.Sleep disturbance, e. Decreased energy, g. Difficulty concentrating or thinking, h. Thoughts of suicide." Martinelli rated Puffenbargers functional limitations under the "B" criteria at: Moderate Degree of limitation with respect to restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation, each of extended duration. Under the "C" criteria, Martinelli rated Puffenbarger at "Evidence does not establish the presence of 'C' criteria." Martinelli did not find Puffenbarger "markedly" limited in any mental residual functional capacity category and opined:

"He [Puffenbarger] has the capacity for routine competitive employment involving short & simple instructions with low pressure, adaptation & social demands." [R. 499-516].

## III.  Administrative Law Judge Decision

The ALJ made the following pertinent findings and conclusions in his decision:

The claimant has the following severe impairments: alcoholism and closed head injury (20 CFR 416.920(c)).  After evaluating the entire record, I find the claimant's alcohol use is material to the finding of disability.  The claimant's alcohol use has resulted in a medical diagnosis of alcohol-induced mood disorder, and no medical source has made a supportable opinion that the claimant has a mental disorder that is not directly related to his use of alcohol. [R. 29].

In evaluating the claimant's alleged mental impairment, the State Agency psychologists and psychiatrists were unable to make a determination as to the severity of any mental impairment because the medical record included insufficient evidence regarding the claimant's mental status in the absence of alcohol use (Exhibits 16F and 19F). [R. 31].

The claimant's representative indicated that the claimant has a bipolar disorder in the absence of alcohol use. ... There is no medical evidence that substantiates this contention, and no list of significant symptoms that indicates the claimant has any manic episodes which satisfies the second requirement of the bi-polar criteria in section 12.04 Affective Disorders of the Listing of Impairments.

The only mental diagnosis which is confirmed by the medical record is alcohol induced mood disorder. ... (Ex 2F)(Ex 8F)(Ex 9F) and (Ex 12F)). [R. 31-32].

## IV. Contentions of the Parties

Puffenbarger contends: The ALJ failed to comply with Policy Instruction EM-96200 and had he done so, a finding of disability would be mandated (Puffenbarger argues the ALJ was required under EM-96200 to find his [Puffenbarger's] admitted alcohol abuse was not a material factor contributing to his claimed disability.  He argues that, while the ALJ found him disabled and that his condition met the requirements of Listings 12.04 and 12.09, the ALJ further found alcohol abuse was material to that disability finding while, at the same time, finding it impossible to separate the mental limitations related solely to alcohol use.

The Commissioner contends:

1) Substantial evidence supports the ALJ's finding that Puffenbarger's symptoms do not satisfy the requirements of 12.04 affective disorders in the absence of his abuse of alcohol.

2) Substantial evidence supports the ALJ's finding that Puffenbarger did not suffer from mental disorders that co-exist with substance use disorders but instead he only suffered from substance - induced disorders within the meaning of DSM-IV.

3) In the absence of coexisting substance use disorders and other mental disorders, the ALJ did not err in finding that Puffenbarger's alcohol abuse was material to the disability determination.

In response to the Commissioner's arguments, Puffenbarger further contends:

1) The ALJ failed to consider all of his impairments at Step Two Of The Sequential Evaluation Process (that the ALJ erred in failing to consider substantial evidence of record that he [Puffenbarger], post closed head injury, suffered with and was diagnosed to have mental disorders [bi-polar] not caused or induced by alcohol abuse).

2) The ALJ substituted his own views for those of trained professionals and in so doing diagnosed substance abuse related disorder which was contrary to substantial evidence of other concurrent and co-existing no-substance abuse related disorder.

3) Dr. Goldizen's opinion that Puffenbarger had a separate non-substance abuse related mental impairment could not be ignored by the ALJ and was substantial evidence of disability.

4) Dr. Stein's post hearing report is substantial new and material evidence confirming Puffenbarger has a separate non-substance related mental disorder and contradicting the finding of the ALJ that Puffenbarger had only a substance abuse related disorder.

In short, Puffenbarger argues there is substantial evidence that he had disabilities from non-substance abuse induced mental disorders and the ALJ should have found that even if Puffenbarger

stopped drinking alcohol, he still would have been disabled by those disorders.

In short, the Commissioner argues that substantial evidence supports the ALJ's conclusion that Puffenbarger's abuse of alcohol induced mental disorder and that if he stopped drinking he would still have some limitations from the long standing abuse of alcohol but they would not be severe enough to prevent him from performing sedentary work.

## V. Analysis

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Application of EM-96200

In reviewing the Secretary's decision, the reviewing court must consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

20 CFR § 404.1535 outlines the process the ALJ is to follow in determining whether alcoholism is a contributing factor material to the determination of disability:

> How we [the Commissioner] will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.
> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

The undersigned concludes the ALJ properly applied the two part analysis required under 20 CFR § 404.1535 and that substantial evidence supports the ALJ's conclusion that Puffenbarger's alcoholism is a contributing factor material to the determination of disability.

The ALJ specifically concluded: "After careful consideration of all the evidence, I conclude

18

the claimant is under a disability, but that a substance use disorder is a contributing factor material to the determination of disability." [R. 27].

In support of this conclusion, the ALJ found: "The claimant's alcohol use **has resulted** in a medical diagnosis of alcohol-induced mood disorder, and no medical source has made a supportable opinion that the claimant has a mental disorder that is ***not directly related to his use of alcohol***." (emphasis added) [R. 29].

As support for the finding the ALJ referenced the September 4, 2004 treatment for having been hit in the head with a sledgehammer noting a negative CT; a normal MRI of the brain and brainstem; x-rays negative of abnormalities; notes of hospital staff that an abnormal gait had predated the head injury and that his headaches, dizziness and blackouts were diagnosed as post traumatic concussion. [Exhibits 2F and 5F].

As additional support for the finding, the ALJ noted Puffenbarger's long history of alcohol abuse; his failure to abstain from abuse of alcohol even for short periods; his repeated denials of the need for or desire for assistance with his alcohol abuse; the tying of each of his multiple suicide attempts to intoxication and ingestion of controlled substances. The undersigned would note that the following from the medical record is the same substantial evidence the ALJ noted considering in reaching his findings:

1) The August 18, 2004 admission, an admission a mere half month prior to the head injury admission, was devoid of diagnosis of depression, anxiety, bi-polar or other mental condition. It was simply an admission to the Emergency Department resulting from Puffenbarger acting out against his mother due to his alcohol consumption and anger. [R.176-186].

2) On November 23, 2004, about 3 months after the head injury, Puffenbarger was at the hospital complaining of blackouts and staggering. He was diagnosed with alcohol intoxication and

alcohol abuse. Puffenbarger exhibited signs of being under the influence while in the presence of the EMS personnel. He refused assistance for the alcohol abuse that was killing him. [R. 230-237].

3) A month later when he was seen for complaints of dizziness and blackouts while crossing the road, Dr. Kramer suspected a bac of 0.202 and discharged urging counseling. [R. 246-247].

4) Less than a month later, on January 4, 2005, Puffenbarger was seen by Dr. Smith for complaints of dizziness and blackouts but his neurological exam was benign. Suspecting his complaints were post concussive syndrome secondary to the prior head injury, Dr. Smith prescribed amitriptyline [R. 261] which he promptly overdosed on in combination with benzodiazepine, marijuana and alcohol (etoh level 0.202). [R. 268-278, 287, 288] . The attempted suicide by overdosing on drugs and alcohol was diagnosed as suicide attempt secondary to situational anxiety and depression with a history of long- term alcohol abuse since age 7. The situational anxiety was explained as his concern that the man who hit him in the head might escape punishment and his abuse of alcohol made him more impulsive at the moment.

Puffenbarger points to Dr. Conell's impressions that he suffered from "depressive disorder NOS, mood disorder NOS, alcohol dependence, and psychosis NOS as support for his claim of a mental disorder independent of the alcohol abuse. Such a reading of the record is simply a convenient compartmentalization of the same and is not consideration of it in its longitudinal totality. [R. 287-293].

5) In less than a month Puffenbarger was evaluated on February 8, 2005 with alcohol dependence by Accurate Assessments of Omaha, NE. [R. 379-384].

6) Between April 21 and 25, 2005 Puffenbarger was treated because he overdosed on his mother's Halcion and on alcohol. When provided with treatment for his alcohol addiction, he reported he attended a few times but preferred spending the $10.00 per visit on alcohol and that he

wanted to kill himself by drinking and overdosing. [R. 295-302].

7) Little more than one month later Puffenbarger was treated for a self inflicted laceration of his wrist, acute alcohol intoxication, possible lorazepam ingestion, depression with suicidal gesture and chronic alcohol dependence. It is during this treatment that the record reflects the first mention that Puffenbarger is trying for disability. The record of this treatment supports the ALJ's conclusion of fact that Puffenbarger took his mother's prescribed Lorazepam in an attempt to grieve her sufficient to have her evict her boyfriend. [R. 30] [R. 311-312, 360].

8) On June 17, 2005 Dr. Shapira found Puffenbarger's memory and cognition intact; his mood and affect pleasant and thoughts to be goal directed without psychosis, suicidality, homicidality, dyscontrol, or confusion. He doubted the prior head injury was having any effect on cognition. He diagnosed adjustment disorder with mixed disturbance of mood and conduct resolved and alcohol dependence. [R. 366-367].

During each of the foregoing events memorialized in paragraphs 1, 2, 3, 4, 6 and 7, Puffenbarger was under the influence of alcohol. Moreover, abuse of alcohol was recorded as the trigger or exacerbating force in each. It was part of the mechanism being used to achieve Puffenbarger's stated end result: ie. paragraph 7, paragraph 3 and paragraph 1.

Listing 12.04 Affective Disorders states:
Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
A. Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all

21

activities; or

      b. Appetite disturbance with change in weight; or

      c. Sleep disturbance; or

      d. Psychomotor agitation or retardation;

or

      e. Decreased energy; or

      f. Feelings of guilt or worthlessness; or

      g. Difficulty concentrating or thinking; or

      h. Thoughts of suicide; or

      i. Hallucinations, delusions or paranoid thinking; or

      2. Manic syndrome characterized by at least three of the following:

      a. Hyperactivity; or

      b. Pressure of speech; or

      c. Flight of ideas; or

      d. Inflated self esteem; or

      e. Decreased need for sleep; or

      f. Easy distractability; or

      g. Involvement in activities that have a high probability of painful consequences which are not recognized;

      h. Hallucinations, delusions or paranoid thinking; or

      3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

      B. Resulting in at least two of the following:

      1. Marked restriction of activities of daily living; or

      2. Marked difficulties in maintaining social functioning; or

      3. Marked difficulty in maintaining concentration, persistence or pace; or

      4. Repeated episodes of decompensation, each of extended duration . . . .

The ALJ evaluated Puffenbarger's record with respect to the criteria of the Section 12.04 affective disorders. The ALJ found "[t]here is no medical evidence that substantiates this contention [Puffenbarger's contention he suffers from bi-polar disorder in the absence of alcohol use], and no list of significant symptoms that indicates that the claimant has any manic episodes which satisfy the second requirement of the bi-polar criteria in Secion 12.04 Affective Disorders of the Listing of Impairments. The only mental diagnosis which is confirmed by the medical record is *alcohol*

*induced mood disorder* (emphasis added by the undersigned). [R. 31]. In finding 3, the ALJ concluded "claimant's substance use disorder, meets sections 12.04 and 12.09: noting that the "A" criteria were satisfied by Puffenbarger's "sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking and multiple suicidal gestures *when intoxicated*." (emphasis added) [R. 33]. The ALJ also found Puffenbarger had moderate restriction of activities of daily living, marked difficulties in maintaining social functioning , and marked difficulties in maintaining concentration, persistence, or pace *when using alcohol*. (emphasis added) [R. 33]. He also found Puffenbarger met the "C" criteria *when using alcohol* because the evidence showed he had "documented history of at least 2 years duration causing more than minimal limitation of ability to do basic work activities, and repeated episodes of decompensation, each of extended duration." (emphasis added)[R. 33]. The undersigned agrees.

DSM-IV-TR identifies two "Substance-Related Disorders:

1.     "Substance Use Disorders," which comprise dependence disorders and substance abuse disorders.

2     "Substance-Induced Disorders," or disorders that are caused by substance use and that in most instances abate when the substance use stops.

In short, substantial evidence of record supports the ALJ's conclusion that all the "mental impairments" appearing in Puffenbarger's medical history prior to obtaining legal counsel for this disability case were alcohol induced disorders as opposed to disorders that existed separate and apart from his alcoholism or coexisted his alcoholism.

Accordingly, the ALJ was not required to follow EM-96200. Answer to question 29 in EM-96200 states in pertinent part:

We know of no research data upon which to reliably predict the expected

improvement in a coexisting mental impairment(s) should drug/alcohol use stop. ...
when it is not possible to separate the mental restrictions and limitations imposed by
DAA and the various other mental disorders shown by the evidence, a finding of "not
material" would be appropriate.

Since the ALJ properly found there were no coexisting mental disorders shown by the
evidence, he was not required to use EM-96200 to find that Puffenbarger's alcohol abuse was not
material.

As the Commissioner points out, there is substantial evidence of record which clearly
supports the ALJ's conclusion that when Puffenbarger was not abusing alcohol or other substances,
his depressive symptoms ceased or subsided. Puffenbarger told Dr. Heidelberg in April 2005 that
"he did not feel he was depressed when he did not drink." [R. 296]. Dr. Mahmood, M.D. resident
in psychiatric medicine at the University of Virginia Charlottesville, Virginia Health System wrote
post wrist slitting incident in June 2005: "He was kept on Librium 25 mg for his alcohol
withdrawal... The patient did well over the course of two days .... At the time of discharge the patient
had brighter affect, normal mood, cooperative with no agitation noted and denied any suicidal or
homicidal ideation." This is in contrast to the note on admission when Puffenbarger presented
having last used alcohol on the day of his admission; having a history of using 12 packs per week
and was denying his alcohol use was a problem. [R199-202]. Approximately four days after his
alcohol induced suicide attempt in January 2005 triggered by his fear the man who hit him in the
head with a sledge hammer would get off, he appeared "alert, verbal, and generally cooperative to
the limits of his ability" and "[h]is stream of thought was [was] basically logical and coherent." [R.
289]. Dr. Heidelberg diagnosed Puffenbarger in April 2005 with "1) alcohol withdrawal, 2) alcohol
dependence, 3) alcohol-induced mood disorder, depressed. He stated: "He is safe in the hospital,
however, and really wants to kill himself by drinking and overdosing." Dr. Heidelberg further noted:

"His depression is obviously secondary to chronic alcohol use." [R. 300]. The record is full of diagnoses of chronic alcohol abuse and dependence triggering suicide attempts; of headaches and depression that diminish when alcohol is removed; of physicians who treated Puffenbarger and did not diagnose a mental impairment coexisting with or separate from alcohol induced problems. {Tr. 312, 231, 198, 293, 289, 189, 207, 204, 372, 383, 247, 366-367, and 196]. Accordingly, the undersigned rejects Puffenbarger's argument that the ALJ separated cause and effect when medical experts of record did not. [DE10, p. 13]. While it is true that the ALJ did not credit Puffenbarger with any period of sobriety of sufficient duration to trigger application of question 27 and 29 of EM-96200, the substantial evidence of record is that medical providers treating Puffenbarger noted that when in the hospital and therefore involuntarily away from alcohol, Puffenbarger's symptoms diminished.

### C. Dr. Goldizen

The undersigned finds that substantial evidence supports the ALJ's analysis of the weight to be given to Dr. Goldizens opinions and the rejection of her conclusion of disability.

20 C.F.R. §416.927 provides in pertinent part:

(e) *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.

(1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the

requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

In <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that, in reviewing for substantial evidence, the reviewing court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Specifically the Court stated:

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano,* 599 F.2d 597, 599 (4th Cir.1979) ("This Court does not find facts or try the case *de novo* when reviewing disability determinations."); *Seacrist v. Weinberger,* 538 F.2d 1054, 1056-57 (4th Cir.1976) ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); *Blalock v. Richardson,* 483 F.2d at 775 ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.' ").

In <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984), the Fourth Circuit stated:

> We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>See,</u> <u>e.g.</u>, <u>Myers v. Califano</u>, 611 F.2d 980, 983 (4th Cir. 1980); <u>Stawls v. Califano</u>, 596 F.2d 1209, 1213 (4th Cir. 1979); <u>Arnold v. Secretary</u>, 567 F.2d 258, 259 (4th Cir. 1977). As we said in <u>Arnold</u>: The courts . . . face a difficult task in applying the

substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

The ALJ fully discusses Dr. Goldizen's conclusions in his decision. [R. 32-33]. In short, the record reflects that Dr. Goldizen did not begin seeing Puffenbarger until January 2006 and only saw him then for an evaluation. Substantial evidence from the record supports the ALJ's conclusions that: Dr. Goldizen did not include any IQ or other cognitive testing to support her opinion that Puffenbarger had "impaired concentration and judgment to the degree that ... even a minimal increase in mental demands or change in environment would cause [him] to decompensate;" did not include any memory or concentration test results to support her finding of "marked difficulties in maintaining concentration, persistence, or pace;" and did not include any progress or office records to confirm the claimant's symptoms and characteristics of bi-polar disorder. [R. 32-22]. In short, the substantial evidence in the record supports the ALJ's conclusion that Dr. Goldizen overstated Puffenbarger's limitations and because her opinions were not supported by history of record and testing, there were opinions without substance deserving no weight.

To the extent Dr. Goldizen opined Puffenbarger was "unable to work" [R. 465], such a conclusion is an opinion on the ultimate issue which is reserved to the commissioner and was therefore properly rejected by the ALJ. Section 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable

to work' does not mean that we will determine that you are disabled.  404.1527(e)(1).

## D.  Failure To Consider All Severe Impairments At Step Two

In his response memorandum [DE 17] Puffenbarger argues the ALJ erred because he failed to consider all of his severe impairments at step two of the sequential evaluation process.  First, Puffenbarger continues his argument previously made that the ALJ improperly failed to find that he suffered from Bi-polar and other mental impairments that coexisted with his substance abuse impairment.  This argument has been previously disposed of herein by the finding that substantial evidence of record established that the alcohol abuse induced mental disorders abated with short durations of forced abstinence and therefore there were no diagnosed mental disorders that existed separate and apart from and that were unrelated to Puffenbarger's alcohol abuse.

To the extent Puffenbarger argues the ALJ should have found that he suffered from other severe mental disorders such as: "depression secondary to tension headaches," "adjustment disorder with mixed disturbance of mood and conduct resolved;" "mood disorder not otherwise specified (NOS)," "psychosis NOS," "depressive disorder NOS," and "psychotic disorder NOS", the substantial evidence in the record establishes they were all conditions diagnosed to have been the result of Puffenbarger's abuse of alcohol and shown by the record to have dissipated with each forced abstinence from alcohol.

## E.  Dr. Stein - New Evidence

In Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.   Wilkins further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .

28

Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Id. at 96.

After the ALJ's adverse decision Puffenbarger filed a new application for DIB. Incident thereto the West Virginia Disability Determination Service sent Puffenbarger to Thomas Stein, ED.D. and Bob Marinelli, ED.D. for evaluation in October and November, 2007 respectively. Stein conducted a clinical interview, conducted a mental status examination on Puffenbarger and administered the Wechsler Adult Intelligence Scale and Wide Range Achievement Tests to him. Stein also reviewed selected medical records: medical discharge summary from West Virginia University Hospital dated May 25, 2007 with diagnoses of alcohol intoxication, respiratory failure, seizure disorder, migraines, bipolar disorder, and very poor dentition; discharge summary from Rockingham Memorial Hospital dated July 15, 2007 with diagnosis of drug overdose with intention to commit suicide, suicidal ideation, alcohol abuse and hypokalemia; and discharge summary from a psychiatric unit at Rockingham Memorial Hospital dated July 18, 2007 with diagnoses of bipolar disorder, NOS, alcohol abuse, Axis II- borderline intellectual functioning and Axis III - history of head trauma, broken jaw, hepatitis C, nicotine abuse and hypokalemia at admission. Puffenbarger's full scale IQ was 66 which matched the mental status conclusion that he was of low average intelligence and the ultimate conclusion that he was of borderline intellectual functioning. His WRAT-3 tests showed he read, spelled and did arithmetic at the 4th grade level. No external factors appeared to affect the objective test results. Stein diagnosed: Axis 1 - Bipolar affective disorder, type 2 (depressed), alcohol dependence, cognitive disorder secondary to past head injury; Axis II - Borderline intellectual functioning; and Axis III - Pst TBI, migraines, left hand weakness and numbness and chronic vertigo. Stein found Puffenbarger's concentration to be moderately deficient; his pace to be moderately slow in his movements, although his speech was quite rapid; and his

29

persistence to be mildly deficient. [R. 492-498]. [See also *supra at* 14].

Marinelli performed a psychiatric review technique finding 12.02 Organic Mental Disorders and 12.04 Affective Disorders. *Supra at* 15.

Puffenbarger asserts the Commissioner erred by concluding that the reports of Stein and Marinelli were not material and in not finding that the conclusion reached in each that Puffenbarger had an affective disorder - bi-polar and that he did not appear to be under the influence of alcohol when interviewed and tested contradicted the findings of the ALJ to the effect that Puffenbarger did not have a mental impairment that coexited his alcohol abuse but was not solely an affect of the alcohol abuse.

While the undersigned will concede that the reports of Stein and Marinelli lend themselves to Puffenbarger's argument as summarized, the reports and the findings in the reports are not material. Had they been accepted and analyzed, they would not have made a difference in the outcome. The conclusion of Marinelli that: "He [Puffenbarger] has the capacity for routine competitive employment involving short & simple instructions with low pressure, adaptation & social demands" [R. 499-516] substantially supports the ALJ's RFP and limitations presented to the VE. In addition, neither Stein or Marinelli found any marked limitations of Puffenbarger's abilities. Therefore, to send the matter back to the Commissioner for re-consideration of Marinelli and Stein as evidence contradicting the ALJ's conclusion that Puffenbarger did not have mental impairment coexisting and separate and apart from his alcohol abuse, while an exercise in procedural completeness, would not result in any difference in substance. Moreover, there is nothing to say that on review, the findings of Stein and Marinelli would not be discounted in the face of the other substantial evidence in the record to the contrary which has already been noted.

Accordingly, the undersigned finds no error in the Commissioner's treatment of the reports

of Stein and Marinelli.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 5th day of August, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE